

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00755-CV

**IN THE INTEREST OF I.F.E.-G.** and R.J.E.-G., Children

From the 218th Judicial District Court, Atascosa County, Texas
Trial Court No. 21-06-0508-CVA
Honorable Melissa Uram-Degerolami, Judge Presiding

Opinion by:　　Luz Elena D. Chapa, Justice

Sitting:　　　　Rebeca C. Martinez, Chief Justice
　　　　　　　　Luz Elena D. Chapa, Justice
　　　　　　　　Beth Watkins, Justice

Delivered and Filed: June 7, 2023

AFFIRMED

B.G.[1] appeals the trial court's order terminating her parental rights to I.F.E.-G. and R.J.E.-G. She challenges the sufficiency of the evidence to support the trial court's grounds for termination and the best-interest finding, and she separately challenges the trial court's conservatorship finding. We affirm.

## BACKGROUND

The Department of Family and Protective Services filed an original petition on March 2, 2021 as to I.F.E.-G. In the petition, the Department sought appointment as I.F.E.-G's temporary managing conservator and termination of B.G.'s parental rights. While the case was pending,

---

[1] To protect the identity of the minor children, we refer to appellant and to the children by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8.

R.J.E.-G. was born. The Department separately filed an original petition on June 18, 2021 as to R.J.E.-G. In the petition, the Department sought appointment as R.J.E.-G.'s temporary managing conservator and termination of B.G.'s parental rights. The trial court consolidated the cases into I.F.E.-G.'s case on August 8, 2022.

On September 19, 2022, the case proceeded to a bench trial via Zoom consisting of testimony from four witnesses and thirteen exhibits.[2] After hearing the evidence, the trial court found the Department established by clear and convincing evidence the grounds for termination set forth in subsections (E) and (O) as to both children, and subsection (D) as to I.F.E.-G. only. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), and (O). The trial court also found by clear and convincing evidence terminating B.G.'s parental rights was in I.F.E.-G. and R.J.E.-G.'s best interests. *See id.* § 161.001(b)(2). Based on its findings, the trial court terminated B.G.'s parental rights to I.F.E.-G. and R.J.E.-G and appointed the Department permanent managing conservator of the children.[3]

B.G. timely appealed the trial court's order, challenging the grounds for termination, the best-interest finding, and the appointment of the Department as managing conservator.

### STANDARD OF REVIEW

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and termination is in a child's best interest. *Id.* § 161.001(b). Clear and convincing evidence requires proof that will produce in the factfinder's mind "a firm belief or conviction as to the truth of the allegations sought to be established." *Id.*

---

[2] Despite efforts to contact her, B.G. did not attend trial.

[3] The trial court also terminated the parental rights of I.F.E.-G. and R.J.E.-G's father.

§ 101.007. To determine if this heightened burden of proof is met, we employ a heightened standard of review by judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This heightened standard "guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). Under it, the factfinder is the sole judge of the weight and credibility of the evidence, including the testimony of the witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). We do not reweigh witness credibility issues, and we "defer to the [factfinder's] determinations, at least so long as those determinations are not themselves unreasonable.'" *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

"When reviewing the sufficiency of the evidence, we apply the well-established [legal and factual sufficiency] standards." *In re J.M.G.*, 608 S.W.3d 51, 53 (Tex. App.—San Antonio 2020, pet. denied) (alteration in original) (quoting *In re B.T.K.*, No. 04-19-00587-CV, 2020 WL 908022, at *2 (Tex. App.—San Antonio Feb. 26, 2020, no pet.) (mem. op.)). In our legal sufficiency review, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we do not disregard undisputed evidence even if it does not support the trial court's finding. *Id.* In our factual sufficiency review, we consider the entire record and determine whether, in light of the entire record, any disputed evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" on the challenged finding. *Id.*

**LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT TERMINATION PURSUANT TO SUBSECTIONS (D) & (E) UNDER TEX. FAM. CODE § 161.001(b)(1)**

B.G. argues the evidence is legally and factually insufficient to support the trial court's findings under subsections (E) and (O) as to both children and (D) as to I.F.E.-G. only. When a parent challenges findings under subsection (D) and/or subsection (E), we must address those grounds even if there are other predicate grounds because of the potential future consequences for parental rights to another child. *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019).

### A. Termination Pursuant to Subsection (D)

To terminate parental rights pursuant to subsection (D), the Department must prove by clear and convincing evidence the parent knowingly placed the child in or allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. *See In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.). "Conditions or surroundings" establishing endangerment include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). "Endanger," as used in section 161.001(b)(1)(D), means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (construing predecessor statute). An environment that endangers the child may be created by the physical living conditions in the child's home or by the conduct of a parent living in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108-09 (Tex. App.—San Antonio 2017, no pet.).

A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *M.R.J.M.*, 280 S.W.3d at 502. A child may therefore be endangered when the home environment creates a potential for emotional or

physical injury; the injurious conduct does not need to be directed at the child and the child does not need to suffer injury for the requirements of subsection (D) to be met. *Boyd*, 727 S.W.2d at 533; *I.N.D.*, 2020 WL 2441375, at *3.

The relevant period for review of conduct and environment supporting termination under ground (D) is the time period before the Department removes the child. *R.S.-T.*, 522 S.W.3d at 109 (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)). Subsection (D) permits termination based upon only a single act or omission. *Id.*

### B. Termination Pursuant to Subsection (E)

Under subsection (E), "endangerment" has the same definition as in subsection (D), but the grounds of subsections (D) and (E) are otherwise different. *See Boyd*, 727 S.W.2d at 533. To terminate parental rights pursuant to subsection (E), the Department must prove by clear and convincing evidence the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(E). Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The course of conduct may include a parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). Scienter is not required for a parent's own acts or omissions; proof of the parent's knowledge is required only when the allegation is the parent placed the child with others who endangered the child. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.).

The Department does not have to prove the parent directed the endangering conduct at the child, did the conduct in the presence of the child, or caused an actual injury or threat of injury to the child. *Boyd*, 727 S.W.2d at 534; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312

S.W.3d 608, 616-17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *M.J.M.L.*, 31 S.W.3d at 351. The danger to the child's well-being may be inferred from the nature of the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533. Thus, in considering whether a course of conduct that endangers the child's physical or emotional well-being has been established, the trial court may consider evidence of the parent's conduct both before and after the child's birth, including conduct occurring after the child was removed from the parent's care. *K.J.G.*, 2019 WL 3937278, at *4; *Walker*, 312 S.W.3d at 617.

### C. The Evidence at Trial Addressing Grounds (D) and (E)

At trial, Jennifer McNulty—a member of the Department's Fatality Division—testified she received an intake for I.F.E.-G. in February 2021 when her brother—J.E.-G.—had died at seven months old under the care of B.G. and the children's father. B.G. explained to McNulty the incident had occurred when she "propped up" seven-month-old J.E.-G. on the couch and gave him a bottle so she could nap. She stated the infant then choked to death on the formula in the bottle. J.E.-G.'s father was not home at the time of the death.

McNulty testified she did not have an autopsy report early in her investigation, but she became aware J.E.-G. had a skull fracture, multiple broken ribs, and a broken humerus. McNulty was concerned J.E.-G. had been physically abused. She interviewed B.G., the children's father, and the children's maternal grandmother. She also observed I.F.E.-G.—who was two years old at the time—and had I.F.E.-G. examined by a doctor who found no injuries.[4]

During the course of her investigation, McNulty learned J.E.-G.'s father had a drug-related criminal history. She also learned the family had a history of domestic violence, causing Child

---

[4] B.G. was pregnant with R.J.E.-G. at the time of J.E.-G.'s death.

Protective Services to become involved. Those cases were ultimately closed because there were no findings. B.G. and the children's father denied there was any domestic violence.

McNulty also learned about J.E.-G.'s medical history. The children's father informed her J.E.-G. had throat surgery when he was born. He was unsure what type of surgery it was, but believed it had to do with the fact the umbilical cord had been wrapped around J.E.-G.'s neck when he was born. He was uncertain as to whether it affected J.E.-G.'s ability to swallow. The children's father further stated J.E.-G. used a nebulizer for the same reason. McNulty further testified J.E.-G. remained hospitalized for approximately three months after he was born. From the time he was taken home from the hospital until his death, J.E.-G. received no medical treatment. McNulty testified J.E.-G. would have required a lot of attention from his caregivers.

McNulty interviewed the parents again approximately one week later, and B.G. offered another explanation for J.E.-G.'s death: she stated two to three days before J.E.-G. died, she placed him—unsecured in his car seat—on the couch. She then stepped away to the kitchen, and J.E.-G. fell with the car seat falling on top of him. B.G. stated his facial bruises had been caused by the car seat. She further stated to McNulty J.E.-G.'s broken ribs could have been caused by CPR. McNulty testified that based on her training the administration of CPR could possibly have caused the rib fractures. However, the couch fall did not cause J.E.-G.'s death because B.G. solely blamed the fall for J.E.-G.'s facial bruises. B.G. did not indicate why he would have had skull and arm fractures. The children's father told McNulty he was aware of the fall because B.G. told him about it and was very upset. He initially stated it happened two to three weeks prior to J.E.-G.'s death before stating it could have been two to three days instead. He told McNulty he pressed J.E.-G.'s head and body after the fall, and J.E.-G. did not seem upset, fussy, or otherwise exhibit a change in behavior. Ryane Balderaz—the caseworker for I.F.E.-G. and R.J.E.-G.—testified the children's

father separately informed her J.E.-G. had fallen from a bed approximately one week before his death.

After interviewing the parents, McNulty explained the Department filed for custody of I.F.E.-G. because the parents' explanation as to J.E.-G.'s death was misleading and because of its concern for I.F.E.-G.'s safety. McNulty testified she was concerned about the ability of the parents to meet the medical needs of the children because J.E.-G. had already missed an appointment in San Antonio before his death. She further testified she was concerned about domestic violence, even though both parents denied it, because Department officials were reporting it in prior cases. McNulty conceded, however, she had no good evidence to say whether abuse or neglect occurred.

Dr. Darshan Phatak, an assistant medical examiner for Harris County, testified he conducted an autopsy on J.E.-G. a little over a week after J.E.-G.'s death, and his autopsy report was admitted into evidence. He concluded J.E.-G.'s manner of death was the combined effect of the blunt force injuries to J.E.-G. sustained days to weeks prior to his death. Dr. Phatak testified B.G.'s explanation of choking on milk was not consistent with his findings. He also testified surgery for some breathing problems, being treated with a nebulizer, and falling off of a couch with a car seat landing on top of him were not consistent with J.E.-G.'s injuries because he had multiple bone fractures. Dr. Phatak explained J.E.-G. was subject to abuse or neglect, which was indicated by fractures of his left parietal bone, right parietal bone, right frontal bone, right parietal epidural hemorrhage, and brain swelling. He reiterated J.E.-G. sustained these injuries days to weeks before death, and the injuries could not have been caused by a single large accident. He further testified this was evident based on, among other things, J.E.-G.'s bones being in various states of repair including callous formation on J.E.-G.'s left humerus and his fractured right forearm. Dr. Phatak explained these were unlikely sites for J.E.-G. to sustain a fracture because at seven months he was not really moving around like an older child; the injury was therefore

consistent with abuse. He further testified J.E.-G.'s bones showed torsion—the twisting of the bone—which is a warning sign for abuse. He explained an outside force twisted it and with enough sufficient strength to cause a fracture. Dr. Phatak further testified the bones of a seven-month-old were malleable and almost rubberized to help avoid injuries, and the force for torsion would have been extreme—something stronger than a fall from a car seat. These injuries were all consistent with J.E.-G. being repeatedly beaten. He conceded if J.E.-G. was born prematurely he could have sustained bone fractures more easily, and it was possible some of the injuries could have been accidental, but he did not believe it was an accident. He also testified the injuries were not consistent with EMS's life-saving measures.

Ryane Balderaz—the caseworker for I.F.E.-G. and R.J.E.-G.—testified B.G. was not in compliance with the service plan. The purpose of completing her services, Balderaz testified, was to mitigate the Department's concerns regarding the safety of B.G.'s children because of J.E.-G.'s death and to explain how J.E.-G. died. Balderaz testified B.G. had not mitigated the Department's concerns. Instead, she maintained the same explanation and offered additional causes of death for J.E.-G. Balderaz testified B.G. offered another theory of the cause of J.E.-G.'s death as physical abuse by the children's blind paternal grandmother. Balderaz testified she investigated this theory with the family of the children's father, and they believed B.G. may have accused I.F.E.-G. because I.F.E.-G. was abused by the grandmother. Balderaz did not believe the grandmother abused I.F.E.-G., testifying they appeared to have a bond in photographs. She further testified when she asked B.G. why she never left the home and why she continued to leave the children unsupervised with the grandmother, if she believed the grandmother abused the children, B.G. told her she was trying to "set up the grandmother" to catch her abusing I.F.E.-G. and R.J.E.-G.

Balderaz further testified there was no indication J.E.-G. received any medical attention for injuries or anything else. She testified this was especially noteworthy since a child with the

extensive injuries of J.E.-G. would have not been easily consoled and would have been very vocal about his pain. She also testified she asked B.G. and the children's father why they did not seek medical care for J.E.-G. if he was injured and in pain, and they indicated they made an appointment scheduled to take place after J.E.-G.'s death. On cross-examination, Balderaz conceded if B.G. did not know the cause of J.E.-G.'s death she would not be able to explain it, but Balderaz was not persuaded B.G. did not know the cause of death. She believed the failure to seek medical care for J.E.-G. spoke to B.G.'s inability to keep her children safe.

Balderaz further testified B.G. never admitted to domestic violence, but she did try to mitigate domestic violence concerns when she left the children's father in December 2021. However, Balderaz added she did not believe B.G. was done with the cycle of violence faced by domestic violence victims because she would not admit the children's father committed acts of domestic violence against her. Balderaz also testified she was not certain B.G. and the children's father remained separated. Her suspicion was related to B.G. knowing, a few weeks before the Department, the children's father was arrested.

B.G. also had only sporadic contact with the children the two months preceding trial. And B.G. did not complete her counseling; she was dismissed for missing sessions around the time she stopped attending when she was arrested for felony injury to a child in connection with J.E.-G.'s death. Balderaz testified she believed neither B.G. nor the children's father could provide a safe and stable environment for the children.

**D. Analysis**

Here, the trial court could have formed a firm belief or conviction B.G.'s actions endangered I.F.E.-G. by exposing her to loss or injury or jeopardizing her emotional or physical health because J.E.-G.'s death was the result of weekslong physical abuse by the parents. The trial court could have also formed a firm belief or conviction J.E.-G. was very vocal and inconsolable

regarding his pain, and both B.G. and the children's father refused to provide him with urgently needed medical care in the days and weeks before his death. *See, e.g.*, *In re B.N.D.*, No. 04-21-00286-CV, 2021 WL 6127883, at *4 (Tex. App.—San Antonio Dec. 29, 2021, no pet.) (mem. op.) (concluding mother's actions including dangerous action of holding child over balcony railing to delay or avoid her arrest created conditions that endangered all of her children's physical and emotional well-beings); *In re A.A.H.*, Nos. 01-19-00612-CV, 01-19-00748-CV, 2020 WL 1056941, at *13 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.). (holding evidence legally and factually sufficient to support trial court's finding that parent knowingly allowed child to remain in conditions that endangered her physical or emotional well-being where evidence showed parent neglected medical needs of another child in home); *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *14 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (concluding endangering conduct need not be directed at children and children need not suffer injury and holding when one child abused in home, it may be inferred other children in home are endangered); *In re T.D.S.*, No. 13-15-00107-CV, 2015 WL 5110472, at *19 (Tex. App.—Corpus Christi–Edinburg Aug. 28, 2015, no pet.) (mem. op.) (evidence of abuse of another child relevant to determining endangerment). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction termination of B.G.'s parental rights was valid under subsection (D) of section 161.001(b)(1). *See J.F.C.*, 96 S.W.3d at 266.

On this record, the trial court could also have formed a firm belief or conviction B.G. engaged in conduct or knowingly placed I.F.E.-G. and B.J.E.-G. with persons who engaged in conduct endangering their physical or emotional well-being because of the abuse of J.E.-G. and B.G.'s decision not to provide him with medical care. The trial court could have further concluded these actions constituted a voluntary, deliberate, and conscious course of conduct by B.G. that

endangered I.F.E.-G. and R.J.E.-G. *See, e.g.*, *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *4 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) (concluding child can be endangered simply by violence that is directed toward another child) (citing *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (concluding evidence as to how parent treated another child relevant regarding whether course of conduct under section E established) (citing *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied)); *In re E.A.W.S.*, No. 2-06-00031-CV, 2006 WL 3525367, at *10 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (concluding if parent abuses or neglects other children, that conduct can be used to support finding of endangerment even against child who was not yet born at time of conduct). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction termination of B.G.'s parental rights was valid under subsection (E) of section 161.001(b)(1). *See J.F.C.*, 96 S.W.3d at 266.

We therefore hold the evidence is both legally and factually sufficient to support the trial court's endangerment finding under subsections (D) and (E). *See* TEX. FAM. CODE § 161.001(b)(1)(D) & (E); *J.O.A.*, 283 S.W.3d at 346 (trial court is sole judge of weight and credibility of evidence, including testimony of Department's witnesses).[5]

### LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE TRIAL COURT'S BEST-INTEREST FINDING

B.G. argues the evidence is legally and factually insufficient to support the trial court's best-interest finding. To terminate parental rights, a trial court must find by clear and convincing

---

[5] Because legally and factually sufficient evidence supports the trial court's termination on (D) and (E) grounds, and a finding of only one ground for termination is necessary to support termination, we need not consider whether the evidence would support termination on subsection (O) grounds. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* TEX. R. APP. P. 47.1.

evidence termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(2). Under Texas law, there is a strong presumption the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a court must also presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See C.H.*, 89 S.W.3d at 27-29.

In determining the best interest of a child, a trial court should consider the factors set out in section 263.307 of the Family Code.[6] Courts also apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent indicating the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the

---

[6] These factors include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after intervention by the department; whether the child is fearful of returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. *See* TEX. FAM. CODE § 263.307(b).

parent. *Id.* Not every factor must be proven for a trial court to find termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27.

In our review of the trial court's best-interest findings, we must consider "the totality of the circumstances in light of the *Holley* factors" to determine whether sufficient evidence supports the challenged finding. *In re B.F.*, No. 02-07-334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.).

## A. The Physical and Emotional Danger to the Children

B.G. argues because she mitigated any domestic violence concerns and completed her domestic violence course, this factor favored reunification. The evidence supporting the trial court's findings under subsections (D) and (E) are probative on the issue of best interest. *See, e.g.*, *C.H.*, 89 S.W.3d at 28; *In re L.I.C.S.*, No. 04-21-00287-CV, 2022 WL 789341, at *7 (Tex. App.—San Antonio Mar. 16, 2022, no pet.) (mem. op.). This evidence shows J.E.-G., while in B.G.'s care, was subject to multiple blunt force injuries over a period of weeks leading to his death. It further shows J.E.-G. would have been inconsolable as a result of his injuries, but he was denied any medical care. Finally, the evidence shows the parents offered inconsistent explanations for B.G.'s death, none of which were supported by the autopsy report. The evidence therefore establishes the potential for future danger to the children.

## B. The Desires of the Children

B.G. argues the children are too young to express their preference, and this factor therefore does not support termination. When children are too young to express their desires like three-year-old I.F.E.-G and one-year-old R.J.E.-G., the factfinder may consider whether the children have bonded with caregivers, are well-cared for by them, and have spent minimal time with a parent. *See In re N.J.D.*, No. 14-17-00711-CV, 2018 WL 650450, at *6 (Tex. App.—Houston [14th Dist.] Feb. 1, 2018, pet. denied) (mem. op.). I.F.E.-G. was initially placed with a paternal aunt. McNulty

testified the paternal aunt was providing great care for I.F.E.-G. and meeting all her needs. Balderaz testified it eventually became overwhelming for her—scheduling visitations was a challenge, she argued with the parents, and occasionally she cut visits short. The paternal aunt also was not able to care for R.J.E.-G. when he was born because she had her own child who required special care. Balderaz asked the parents for other family members. A maternal aunt was a possibility, but she "backed out." They also conducted a home study on the maternal grandparents, but they were not accepted because (1) of the condition of their home, (2) the children's father had previously tried to kick in their door, and (3) the grandparents did not believe the children should have been removed from their parents. Balderaz testified that as a result there was a concern about their ability to protect the children.

R.J.E.-G. was placed with an Atascosa County foster family a few days after he was born in May 2021, and the family agreed to foster I.F.E.-G. in December 2021, reuniting the siblings.[7] Balderaz testified they are doing "very well" with the family and are "happy." She testified they have monthly check-ins with the family, and the foster mother sends a monthly email with updates as well. The children are "very bonded" with their foster parents. R.J.E.-G. refers to the foster parents as "mom" and "dad." I.F.E.-G. started school in the fall of 2022 and was doing well behaviorally. B.G. appeared to regularly attend visits until the month before trial when the

---

[7] The paternal aunt contacted Balderaz in August 2022—the month before trial—indicating she wanted to have both children placed with her after all. Balderaz spoke with her and informed her of the concerns the Department had surrounding J.E.-G.'s death because she was concerned the paternal aunt was unaware of the full basis for removal and the extent and severity of J.E.-G.'s injuries. Balderaz testified the paternal aunt did not believe the children's father caused any harm to J.E.-G. The paternal aunt had also been uncertain she could care for I.F.E.-G. permanently during the initial placement and did not believe she was a viable long-term option for I.F.E.-G.'s adoption. Balderaz further testified the children's guardian ad litem was against changing the placement late in the case, and the Department agreed. Balderaz testified the children were also too bonded with the foster family to remove them from their care.

children's father was arrested and, according to Balderaz, B.G. assumed she would no longer be able to visit with the children.[8]

Balderaz believed it was in the children's best interest to remain with the foster parents because the children were bonded with them and building a relationship with the foster parents' extended family. She also favored termination because there was domestic violence between the parents, and the parents continued to be dishonest about J.E.-G.'s death. She testified it was not safe to return the children to B.G. because they could potentially face similar injuries.

The foster mother also testified in support of termination. She testified she had two older adopted daughters that were twelve years old and ten years old. I.F.E.-G. had a very good bond with the ten-year-old; they were always together. She further testified R.J.E.-G. is very bonded with her and his foster dad. The foster mother also testified she and the children's foster father love the children and want to adopt them and give them the best life possible.

### C. B.G. Failure to Comply with the Service Plan

B.G. further argues it was in the children's best interest to return them to her because she substantially engaged in the service plan by completing parenting and domestic violence classes, completing her psychological and psychiatric evaluations, and engaging in counseling. She further argued she was denied the opportunity to comply with the home visits due to the Department's unannounced visits. This evidence is undisputed. However, the trial court also heard evidence B.G. failed to comply with the service plan, and such evidence is probative of the children's best interest. *See, e.g.*, *In re B.R.T.*, No. 04-22-00416-CV, 2023 WL 29381, at *6 (Tex. App.—San Antonio Jan. 4, 2023, no pet.) (mem. op.). The evidence shows B.G. had not been in regular contact with the Department the final few months before trial, B.G. was discharged from counseling for missing

---

[8] The week before trial, B.G. contacted Balderaz to state she did not want to stop visitation.

many sessions around the time she was arrested in connection with J.E.-G.'s death, and B.G. never provided proof of a stable income.

Based on this evidence, we conclude the trial court could have reasonably formed a firm belief or conviction termination of B.G.'s parental rights was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266. We further conclude any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best-interest finding or was not so significant the trial court could not have reasonably formed a firm belief or conviction termination was in the children's best interest. *See id.* We therefore hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE § 161.001(b)(2).

### THE TRIAL COURT'S CONSERVATORSHIP FINDING

B.G. contends the trial court abused its discretion in making its conservatorship finding because its termination order was based on insufficient evidence. However, the trial court's conservatorship order was not made solely as a consequence of the termination order. It was instead based on the trial court's findings that appointment of B.G. as a managing conservator was not in the best interest of the children and such appointment would significantly impair their physical health or emotional development. *See* TEX. FAM. CODE § 153.131 (authorizing appointment of Department as nonparent managing conservator if trial court makes certain findings). B.G. does not challenge the trial court's findings that her appointment as managing conservator would significantly impair the children's physical health or emotional development. *See In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007) (holding parent must specifically challenge trial court's section 153.131 findings because such a challenge not subsumed within parent's challenge to termination order). Because she does not challenge these findings, and we have already held the evidence supports termination is in the children's best interest, we affirm the trial court's conservatorship finding. *See In re M.C.L. IV*, No. 04-21-00276-CV, 2022 WL 218998, at

*7-8 (Tex. App.—San Antonio Jan. 26, 2022, no pet.) (mem. op.) (same); *see also In re B.F.H-J.*, No. 04-20-00461-CV, 2021 WL 111922, at *5 (Tex. App.—San Antonio Jan. 13, 2021, no pet.) (mem. op.) ("Having determined the evidence is legally and factually sufficient to support the termination of R.J.'s parental rights, we further hold the trial court did not abuse its discretion in appointing the Department as the managing conservator of the children."); *In re L.P.*, No. 04-20-00140-CV, 2020 WL 5027385, at *13 (Tex. App.—San Antonio Aug. 26, 2020, pet. denied) (mem. op.) ("Because we are affirming the trial court's termination order, we need not address the conservatorship issue.").

## CONCLUSION

We affirm the trial court's order.

Luz Elena D. Chapa, Justice